UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DOC EUGENE WARREN, III                        CIVIL ACTION

VERSUS                                                      NO. 16-15046

MARLIN N. GUSMAN ET AL.                       SECTION "G" (2)

## REPORT AND RECOMMENDATION

Plaintiff, Doc Eugene Warren, III, is a prisoner incarcerated in the Justice Center of Orleans Parish prison system ("OPP"). He filed this complaint pro se and in forma pauperis pursuant to 42 U.S.C. § 1983 against Orleans Parish Criminal Sheriff Marlin N. Gusman; Correct Care Recovery Solutions; Aramark Correctional Services, LLC (incorrectly named by plaintiff as Airmark Food Service); and Nurse Martin. Warren alleges that he was subjected to unconstitutional conditions of confinement, including lack of privacy, improper meals, inadequate medical care and verbal harassment, while incarcerated in OPP. He seeks monetary damages and injunctive relief. Record Doc. No. 1 (Complaint at ¶¶ IV and V).

On November 15, 2016, I conducted a telephone conference in this matter. Participating were plaintiff pro se; Charlin Fisher, Stephanie Murphy and Adam Zuckerman, counsel for defendants. Plaintiff was sworn and testified for all purposes permitted by Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985), and its progeny.

## **THE RECORD**

Warren testified that he is currently incarcerated in OPP as a pretrial detainee on a robbery charge.  He stated that he has been incarcerated in OPP since May 16, 2016, when he was extradited to Louisiana from Georgia.  Warren confirmed that he asserts four kinds of claims arising from his incarceration in OPP, including (1) his privacy rights have been violated because he is subject to video surveillance while using the bathroom, (2) he has received inadequate medical care, (3) his meals are inadequate and (4) he has been subjected to verbal mistreatment.

As to his first claim, Warren complained that Sheriff Gusman illegally uses surveillance video in the jail.  He stated that, "every time I use the bathroom, I'm being exposed to the web cameras . . . set up to monitor the inmate population."  He testified that, upon his arrival at OPP, "there were partitions up in the restroom area," but "Sheriff Gusman ordered the engineers to take the partitions down" due to some other "mitigating factors;" specifically, a lawsuit filed as a result of an inmate having committed suicide in the bathroom.  Warren confirmed his understanding that the partitions were taken down to prevent that kind of inmate harm, but he alleged that "all the world can see" him when he uses the bathroom.  He speculated that any person with the proper "website information" could pull up the OPP security video on a smart phone.

Warren said he believes that anyone with access to the OPP website can view video of what is seen on the OPP security cameras because he saw an OPP guard use her phone to view video of a recent fight between inmates in the bathroom area of the jail, so that "she

could see who the aggressor was." He said that, if that guard could see the video on her phone, he assumed that any member of the public could also view the OPP security videos, although he conceded he did not know that as a fact. "Anybody could hack into it," he said, adding particularly that "my concern is that there should have been partitions to replace the ones that they took down." Warren said that partitions were formerly located between the toilet stalls, separating each stall so that inmates could "have a little privacy from the next guy." He alleged that the OPP security camera can see everything now, "so you don't have any privacy anymore."

As to his medical care claim, Warren acknowledged that he had received the OPP medical records that I previously ordered the sheriff to produce; that he had not yet finished reviewing them; and that what he had reviewed thus far was accurate, except that records concerning some of his doctors' appointments and his medical complaints were not there. For example, he stated that he had seen Dr. Kennedy at OPP for a medical review regarding his hernia and that Dr. Kennedy told Warren he needed a hernia operation but would probably not get it because of lack of funding. Plaintiff said that the medical records did not reflect that conversation.

Warren testified that he reported to intake deputies upon his arrival at OPP from Georgia that he had been scheduled for hernia surgery in Georgia before his extradition. He stated that the scheduled hernia operation in Georgia was cancelled when the extradition papers were served. He stated that he told OPP medical staff about the cancellation, but nothing had been done at OPP to obtain his hernia operation, despite his "excruciating

3

pain" from the condition.  Warren testified that a doctor at the Atlanta Pretrial Detention Facility had recommended hernia surgery at Grady Hospital in Georgia.  He said he has not received hernia surgery or any other attention for his hernia at OPP, except Motrin for the pain.

Warren was asked during his testimony about the following notation in one of his medical records entitled "Progress Notes," signed by Dr. Dunbar and dated July 5, 2016: "[I]nguinal hernia for five years.  Patient seen by doctor on 6/29.  Hernia confirmed by physical examination.  Hernia easily reducible,[1] which indicates it is not incarcerated or strangulated.[2] Those aforementioned conditions constitute a medical emergency, which he does not have.  Therefore, this operation may be done electively."  Warren stated that he had not seen that particular record, but he noted Dr. Kennedy's separate June 29, 2016 "Physician's Orders" in the records referring him for a surgery consult, which he said was the surgery consultation he had on July 5, 2016 with Dr. Dunbar.  Warren also confirmed

---

[1]To reduce is "to correct (as a fracture or a herniated mass) by bringing displaced or broken parts back into their normal positions."  MedlinePlus (Merriam-Webster, Inc. 2017), http://c.merriam-webster.com/medlineplus/reduce (visited Feb. 24, 2017).

[2]"An inguinal hernia occurs when tissue, such as part of the intestine, protrudes through a weak spot in the abdominal muscles.  The resulting bulge can be painful, . . . [but] isn't necessarily dangerous."  MayoClinic.org (Mayo Foundation for Medical Education and Research 1998-2017), http://www.mayoclinic.org/diseases-conditions/inguinal-hernia/home/ovc-20206354   (visited Feb. 22, 2017).

> You should be able to gently push the hernia back into your abdomen when you're lying down. . . .  If you aren't able to push the hernia in, the contents of the hernia can be trapped (incarcerated) in the abdominal wall.  An incarcerated hernia can become strangulated, which cuts off the blood flow to the tissue that's trapped.  A strangulated hernia can be life-threatening if it isn't treated.

Id., http://www.mayoclinic.org/diseases-conditions/inguinal-hernia/symptoms-causes/dxc-20206367.

the notations in his medical records that he had been prescribed and received both Mobic[3] and naproxen[4] for pain resulting from the hernia, but said he had refused the Mobic after a few usages because he concluded it was not working.  He also confirmed that he was seen by Dr. Gonzales in a chronic care unit on July 12, 2016, for both his hernia and hepatitis C. He said that Dr. Gonzales told him to contact the medical unit at OPP if his hernia continued to hurt.  Plaintiff complained that his hernia continues to cause pain and that he is not taking naproxen because it does not work and "somebody told me . . . it wasn't nothing but a souped up Tylenol," so he refused to take any more naproxen or Mobic.

Warren stated that he also has hepatitis C, which affects his liver, and "that's one of the reasons that it's not good [for me] to take a lot of pain pills."  He testified that he had spoken about his treatment to Dr. Kennedy at OPP, who said "we gotta treat you for hepatitis A and hepatitis B," because "otherwise you could die."  Warren complained that he was required to request special blood testing for hepatitis C.  He confirmed that he had been blood-tested for hepatitis C about three weeks before the hearing.[5]

---

[3]Mobic (generic name:  meloxicam) is a nonsteroidal anti-inflammatory drug ("NSAID") used to relieve symptoms of osteoarthritis and rheumatoid arthritis.  PDR.net (PDR, LLC 2017), http://www.pdr.net/pdr-consumer-monograph/mobic?druglabelid=1245&ConsumerId=1546 (visited Feb. 22, 2017).

[4]Naproxen is a generic NSAID used to treat rheumatoid arthritis, osteoarthritis, arthritis of the spine, tendinitis, bursitis, gout and pain. Id., http://www.pdr.net/pdr-consumer-monograph/anaprox-ec-naprosyn-naprosyn?druglabelid=2069&ConsumerId=1283 (visited Feb. 22, 2017).

[5]Warren's supplemental medical records obtained from OPP after the Spears hearing, Record Doc. No. 31, include records of lab results dated October 29, 2016, reflecting a liver function test with results "all within normal limits."

Warren testified that he also suffers from various allergies. He confirmed the references in his medical records that he has received various medications for his allergies, including a recent Benadryl[6] injection. He expressed dissatisfaction, however, that he has not been sent for special testing to determine the exact allergen in the jail to which he is allergic. He asserted that, while the medications he receives address his symptoms, only the special allergy testing he seeks will provide a real remedy because it seems to him that something in the jail causes him to break out in hives. He said he was scheduled to see a doctor at OPP at the conclusion of the conference that day, having already been seen by a doctor at OPP as recently as one week earlier for the same thing. "It's something that's causing . . . my throat to almost close. . . . I'm asking them to send me out to a specialist to see what's really going on with it."

Warren stated that he had an accident before his incarceration in which a forklift ran over his right foot. He said he had hired a lawyer[7] to pursue a claim and had seen several doctors at the Louisiana Pain Clinic to treat his foot. He stated that he had received "a tennis shoe profile" from that clinic, which he asked the OPP doctors to fill but without a response to date, because it is difficult for him to walk.

---

[6]Benadryl (generic name: diphenhydramine) is an antihistamine "used to treat sneezing; runny nose; itching, watery eyes; hives; rashes; itching; and other symptoms of allergies and the common cold." Drugs.com (2017), https://www.drugs.com/benadryl.html (visited Feb. 22, 2017)

[7]"Morris Bart," he testified.

In summary, Warren said, "All across the board, I'm not getting the proper medical treatment that's required.  The [OPP] medical staff . . . maybe have a lot of things going on . . . maybe they don't have the money. . . ."

As to his claim concerning inadequate meals, Warren testified that "the meals . . . are not ideal. . . .  They cannot prepare a meal that coincides with my diet, with my allergies."  He stated that his diet requires that he eat no seasoning, no fish and no mayonnaise products.  Asked what he can eat, he said, "I can eat food that is not seasoned, properly prepared vegetables, stuff like that."  He said "properly prepared" means "properly cooked," not food that is "overcooked" like at OPP, where he said the food is cooked off-site, then transported to the inmates in a "hot box" that keeps the food warm, but also continues to cook it.

Asked to describe the content of his daily meals, Warren said that breakfast includes grits, sausages, potatoes, bread, oatmeal, eggs or cereal; lunch includes meat with seasoning "until recently," potato salad, macaroni salad, bologna, peanut butter and ham salad; and dinner includes fish, potatoes with bread, macaroni salad, and sometimes rice and beans with meat added.  He complained that, although he gets vegetables, he does not get fruit or milk.  He said he cannot eat the food at OPP because he is allergic to seasonings, fish and mayonnaise products.  He stated that he had "lost a few pounds" while in jail and that he weighs about 205 pounds and is 6'3" tall.  He said he was diagnosed with these food allergies in 2002 while he was in prison in Alabama.

As to his final claim of verbal mistreatment by Nurse Martin, Warren testified that one day an older inmate was throwing up blood in the bathroom area, and that no one from the OPP medical unit could see the inmate until about an hour and a half later, when Nurse Martin showed up. Warren said that when he asked Nurse Martin about her slow response time, she responded, "You just shut the fuck up . . . and let me do my job." When Warren replied that he would tell Sheriff Gusman about it, she told him, "You don't need to tell Gusman about this." Warren described the nurse's comments as "very unprofessional."

After the hearing, the record was supplemented with up-to-date medical records from OPP and the Fulton County, Georgia jail. Record Doc. No. 33. In addition, after the hearing, defendant Aramark Correctional Services, LLC filed a motion to dismiss plaintiff's claims pursuant to Fed. R. Civ. P. 12(b)(6) on grounds of failure to state a claim upon which relief can be granted. Record Doc. No. 25. Plaintiff filed a response to defendant's motion, and defendant was granted leave to file a reply memorandum. Record Doc. Nos. 32, 34-36. The motion is addressed in this report.

Warren filed two motions seeking a preliminary injunction or temporary restraining order in this matter after the hearing. Record Doc. Nos. 27, 30. Those motions are also addressed in this report.

The medical records from Fulton County Jail reflect that plaintiff submitted a medical request on April 21, 2016 because of a painful hernia and skin allergies, and requested a special diet because of allergies to spicy food. On April 27, 2016, he reported

foot pain and hepatitis C.  He saw a health care provider on May 10, 2016 with complaints of allergies to seafood, iodine and tomatoes, and a chronic hernia.  Physical examination revealed an easily reducible right inguinal hernia.  Warren was given Motrin, a hernia belt and a bottom bunk.  Allergen test results dated May 12, 2016 revealed allergies to tomato and coconut, but not to seafood.

The medical records from OPP reflect that plaintiff reported at his intake screening on May 16, 2016 that he was allergic to spicy foods, which caused hives, and that he had hepatitis C in 2005, a hernia and a foot injury in 2015 for which he took pain medication as needed.  The OPP records include medical records from St. Bernard Parish Hospital dated August 7 and 20, 2015, which indicate that Warren suffered a right ankle and foot injury.  X-rays and other tests on those dates revealed no fracture, soft tissue abnormality or vascular compromise.

Warren was seen by a nurse at OPP on May 19, 2016, when he reported that he was in pain from his hernia and foot injury.  He was given ibuprofen.

A nurse saw Warren on May 23, 2016 and noted that he ambulated without difficulty.  On May 25, 2016, Xuong Nguyen, M.D., examined plaintiff for an allergic skin rash with itching, a different rash on his feet and a small, easily reducible, right groin hernia.  Warren reported that he was allergic to the seasoning in spicy foods.  Dr. Nguyen prescribed Tylenol, Zyrtec,[8] hydrocortisone cream for plaintiff's body rash and povidone

---

[8]Zyrtec (generic name:  cetirizine hydrochloride) is an antihistamine used to relieve allergy symptoms, such as watery eyes, runny nose, itching eyes/nose, sneezing, hives and itching.

iodine[9] ointment for his foot rash.  Dr. Nguyen completed a diet order that noted plaintiff's allergies to seasoning and spicy foods.

On June 21, 2016, plaintiff was seen in the OPP chronic care clinic for hepatitis C, urticaria[10] and tinea pedis.[11]  He reported having urticaria after ingesting another inmate's food.  He said that Zyrtec was not helping, he was allergic to it, he could not take Tylenol and his athlete's foot rash was not responsive to the prescribed ointment.  He reported a history of hepatitis C, for which he had never been treated and had no symptoms.  The treatment plan included povidone iodine foot soaks, Atarax,[12] ibuprofen and testing for hepatitis A, B and C.  His lab test results were positive for hepatitis C on June 24, 2016.

Plaintiff refused wound care on three occasions between June 22 and June 30, but was treated for rashes on his feet on July 1, 2016.

------

WebMD.com (WebMD, LLC 2005-2017), http://www.webmd.com/drugs/2/drug-12127/zyrtec-oral/details (visited Feb. 24, 2017).

[9]Betadine (generic name:  povidone iodine) is a topical broad-spectrum germicidal agent used for skin preparation before surgery and infection prophylaxis in minor burns, cuts and scrapes. PDR.net, http://www.pdr.net/drug-summary/Betadine-5--povidone-iodine-2152 (visited Mar. 1, 2017).

[10]Otherwise called hives.  MedlinePlus, http://c.merriam-webster.com/medlineplus/urticaria (visited Feb. 24, 2017).

[11]Otherwise called athlete's foot.  Id., http://c.merriam-webster.com/medlineplus/tinea%20pedis (visited Feb. 24, 2017).

[12]Atarax (generic name:  hydroxyzine) acts as an antihistamine, is used as a sedative to treat anxiety and tension, and is also used to treat allergic skin reactions such as hives or contact dermatitis.  Drugs.com, https://www.drugs.com/atarax.html (visited Mar. 1, 2017).

On June 27, 2016, S. Kennedy, M.D., saw Warren for complaints of right inguinal hernia pain and ordered a general surgery consult.  Dr. Kennedy discontinued ibuprofen because Warren was refusing it, and started him on Mobic.  Although plaintiff complained of welts, Dr. Kennedy observed none.  Warren reported that Zyrtec and Atarax were not helping.  Dr. Kennedy noted that Warren had refused these medications and wanted Benadryl.  Dr. Kennedy advised plaintiff that Benadryl was not available.

On July 5, 2016, Dr. Dunbar reviewed Warren's chart and noted "a history of inguinal hernia for five years.  Patient seen by doctor on 6/29.  Hernia confirmed by physical examination.  Hernia easily reducible, which indicates it is not incarcerated or strangulated.  Those aforementioned conditions constitute a medical emergency, which he does not have.  Therefore, this operation may be done electively."

Warren was seen in the chronic care clinic on July 12, 2016 for followup of hernia pain and hepatitis C.  Herman Gonzalez, M.D., noted that plaintiff had been refusing his pain medication and that his hernia was not incarcerated or strangulated.  Dr. Gonzalez discontinued Mobic and prescribed naproxen and povidone iodine ointment.

Warren reported to Dr. Nguyen on August 29, 2016 that the ointment had not relieved his athlete's foot rash.  Dr. Nguyen prescribed calamine lotion daily and noted that plaintiff's hernia remained easily reducible.  Plaintiff refused wound care for athlete's foot four times in the next week.

On October 3, 2016, plaintiff received a Benadryl injection for a hives outbreak. Dr. Nguyen noted that Warren was not adhering to his medication or diet, and prescribed Benadryl, Zyrtec and terbinafine (Lamisil)[13] for tinea pedis and tinea versicolor.[14]

Plaintiff was seen by a nurse practitioner on October 26, 2016 for followup of his tinea pedis and tinea versicolor and for complaints of pain resulting from a forklift having run over his right foot in August 2015. Warren asked to wear tennis shoes because of numbness in his right foot. Physical examination of the foot revealed full range of motion with mild pain on flexion, tenderness to touch and no swelling. Warren was advised to apply warm compresses and use ibuprofen for pain. His tinea pedis was under fair control. He was to continue using Lamisil for two weeks and Zyrtec. The nurse practitioner ordered a liver function test and a regular diet, but noted plaintiff's allergies to spicy food, iodine and mayonnaise on the diet order. Hepatic function panel results on October 29, 2016 were within normal limits.

Warren complained on November 1 and 6, 2016 that the allergy medications were not working. He wanted Benadryl for large welts and a feeling that his throat was closing. He was seen by Dr. Nguyen on November 7, 2016 for skin rash on his trunk and neck and a right inguinal hernia. Dr. Nguyen noted that Warren was not compliant with his

---

[13]Lamisil (generic name: terbinafine hydrochloride) is an oral or topical antifungal medication. PDR.net, http://www.pdr.net/drug-summary/Lamisil-AT-Cream-terbinafine-hydrochloride-2369.726 (visited Mar. 2, 2017).

[14]Tinea versicolor is a long-term (chronic) fungal infection of the skin. MedlinePlus, https://medlineplus.gov/ency/article/001465.htm (visited Mar. 2, 2017).

medication or diet, but his urticaria and tinea pedis were under fair control.  Dr. Nguyen

prescribed Benadryl and prednisone[15] and discontinued Lamisil.

Warren was seen for chronic hives by health care providers on November 11, 12,

15 and 21, 2016.  On November 15, 2016, he received prescriptions for Atarax and

prednisone and was ordered moved to another cell.

## ANALYSIS

### I.    SCREENING STANDARDS OF REVIEW

A prisoner's pro se complaint for alleged civil rights violations must be screened by

the court as soon as practicable after docketing, regardless whether it has also been filed

in forma pauperis.  28 U.S.C. § 1915A(a); Lewis v. Estes, 242 F.3d 375, 2000 WL

1673382, at *1 (8th Cir. 2006); Shakur v. Selsky, 391 F.3d 106, 112 (2d Cir. 2004); Martin

v. Scott, 156 F.3d 578, 579-80 (5th Cir. 1998).  Such complaints by prisoners must be

dismissed upon review if they are frivolous or fail to state a claim upon which relief can

be granted.  28 U.S.C. § 1915A(b)(1); Shakur, 391 F.3d at 113; Carr v. Dvorin, 171 F.3d

115, 116 (2d Cir. 1999).

"A federal court may dismiss a claim in forma pauperis 'if satisfied that the action

is frivolous or malicious.'" Moore v. McDonald, 30 F.3d 616, 620 (5th Cir. 1994) (quoting

former 28 U.S.C. § 1915(d), now incorporated in 28 U.S.C. § 1915(e), as amended).  A

---

[15]Prednisone is a corticosteroid used to improve symptoms of certain allergic disorders.  PDR+,
http://www.pdr.net/pdr-consumer-monograph/prednisone?druglabelid=2575&ConsumerId=1121
(visited Mar. 2, 2017).

complaint is frivolous "if it lacks an arguable basis in law or fact." Davis v. Scott, 157 F.3d 1003, 1005 (5th Cir. 1998); Reeves v. Collins, 27 F.3d 174, 176 (5th Cir. 1994).  The law "'accords judges not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless.'" Macias v. Raul A. (Unknown), Badge No. 153, 23 F.3d 94, 97 (5th Cir. 1994) (quoting Neitzke v. Williams, 490 U.S. 319, 327 (1989)).

The purpose of a Spears hearing is to dig beneath the conclusional allegations of a pro se complaint, to ascertain exactly what the prisoner alleges occurred and the legal basis of the claims.  Spears, 766 F.2d at 180.  "[T]he Spears procedure affords the plaintiff an opportunity to verbalize his complaints, in a manner of communication more comfortable to many prisoners."  Davis, 157 F.3d at 1005. The information elicited at such an evidentiary hearing is in the nature of an amended complaint or a more definite statement under Fed. R. Civ. P. 12(e).  Wilson v. Barrientos, 926 F.2d 480, 481 (5th Cir. 1991); Adams v. Hansen, 906 F.2d 192, 194 (5th Cir. 1990).  "Upon development of the actual nature of the complaint, it may also appear that no justiciable basis for a federal claim exists."  Spears, 766 F.2d at 182.

The court may make only limited credibility determinations in a Spears hearing, Norton v. Dimazana, 122 F.3d 286, 292 (5th Cir. 1997) (citing Cay v. Estelle, 789 F.2d 318, 326-27 (5th Cir. 1986), overruled on other grounds by Denton v. Hernandez, 504 U.S. 25 (1992)), and may consider and rely upon documents as additional evidence, as long as

they are properly identified, authentic and reliable.  "The Court should allow proper cross-examination and should require that the parties properly identify and authenticate documents.  A defendant may not use medical records to refute a plaintiff's testimony at a Spears hearing."  Id. (citing Wilson, 926 F.2d at 482-83; Williams v. Luna, 909 F.2d 121, 124 (5th Cir. 1990)).  However, "'[m]edical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference.'"  Gobert v. Caldwell, 463 F.3d 339, 347 n.24 (5th Cir. 2006) (quoting Banuelos v. McFarland, 41 F.3d 232, 235 (5th Cir. 1995)) (internal citations omitted).

After a Spears hearing, the complaint may be dismissed as legally frivolous if it lacks an arguable basis in law, Jackson v. Vannoy, 49 F.3d 175, 176-77 (5th Cir. 1995); Moore v. Mabus, 976 F.2d 268, 269 (5th Cir. 1992), or "as factually frivolous only if the facts alleged are 'clearly baseless,' . . . [or] when the facts alleged rise to the level of the irrational or wholly incredible."  Id. at 270.

"'A complaint lacks an arguable basis in law if it is based on an indisputably meritless legal theory, such as if the complaint alleges the violation of a legal interest which clearly does not exist.'"  Davis, 157 F.3d at 1005 (quoting McCormick v. Stalder, 105 F.3d 1059, 1061 (5th Cir. 1997)).  "When a complaint raises an arguable question of law which the district court ultimately finds is correctly resolved against the plaintiff, dismissal under Rule 12(b)(6) is appropriate; however, dismissal under the section 1915(d) standard is not."  Moore, 976 F.2d at 269.  A prisoner's in forma pauperis complaint which fails to state a

claim may be dismissed sua sponte at any time under 28 U.S.C. § 1915(e)(2) and 42 U.S.C. § 1997e(c)(1).

In this case, plaintiff's claims should be dismissed under 28 U.S.C. § 1915(e) and 42 U.S.C. § 1997e(c)(1), either as frivolous because they lack an arguable basis in law, or under Rule 12(b)(6) in light of his testimony explaining the factual basis of his claims. Even under the broadest reading,[16] plaintiff fails to state a cognizable cause of action under Section 1983 that his constitutional rights were violated.

## II.    EVALUATION OF PLAINTIFF'S CLAIMS

### (A)    Privacy in the Bathroom

Warren asserts that his privacy rights have been violated because he is subject to video surveillance while using the bathroom. In the First Amendment context, the Supreme Court in dicta has stated that though "inmates lose many rights when they are lawfully confined," they "retain certain fundamental rights of privacy; they are not like animals in a zoo to be filmed and photographed at will by the public or by media reporters." Houchins v. KQED, Inc., 438 U.S. 1, 5 n.2 (1978). The Houchins case, however, dealt with media rights of access to prisoners, id. at 5, rather than prisoner surveillance by jail officials for inmate safety and security purposes, as alleged by Warren in this case. In another context, the Supreme Court has declared that a prison inmate retains only those rights that are "not

---

[16]The court must "liberally construe briefs of pro se litigants and apply less stringent standards to parties proceeding pro se than to parties represented by counsel," Smith v. Lonestar Constr., Inc., 452 F. App'x 475, 476 (5th Cir. 2011) (quotation omitted); Moore v. McDonald, 30 F.3d 616, 620 (5th Cir. 1994), and I have done so in this case.

inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822 (1974). In analyzing the privacy interests of prisoners themselves, the Ninth Circuit has stated: "The prisoners' [privacy] claims are best supported analytically under the fourth amendment's guarantee of one's legitimate expectation of privacy against unreasonable searches and seizures . . . and under the liberty component of the fourteenth amendment." Grummett v. Rushen, 779 F.2d 491, 493 n.1 (9th Cir. 1985) (emphasis added).

In a case involving photographs of prisoners taken by law enforcement agents, the Tenth Circuit has held that a prisoner's rights are "not violated unless (a) he had a legitimate expectation of privacy in the photos, and (b) his privacy interest outweighed the public need for their disclosure." Slayton v. Willingham, 726 F.2d 631, 635 (10th Cir. 1984). Despite the limited protection some courts have recognized for videotaped images of a prisoner, "speculative fear that . . . privacy rights will be injured if [a] videotape is shown in the future . . . is not a 'real and immediate' injury redressable by a federal court." Scott v. Gier, 29 F.3d 634, 1994 WL 283621, at *1 (9th Cir. 1994). A prisoner must show that "the videotape would likely cause . . . substantial and immediate injury to a legally-protected interest." Id. at *2.

In Garrett v. Thaler, 560 F. App'x 375 (5th Cir. 2014), the Fifth Circuit held that an inmate failed to state a constitutional claim when he alleged that "video recording cameras in the restrooms, showers, and dressing areas of the prison–as well as female officers'

viewing of male inmates both in those areas and on the cameras–violate[d] his expectation

of minimal privacy under the Fourth Amendment." Id. at 380. The court explained that

> prisoners have a minimal right to bodily privacy. But, even if a prison
> regulation "impinges on inmates' constitutional rights, the regulation is valid
> if it is reasonably related to legitimate penological interests." To determine
> the reasonableness of a prison restriction, we consider the four factors
> outlined by the Supreme Court in Turner: (1) whether there is a "valid,
> rational connection between the prison regulation and the legitimate
> government interest put forward to justify it," (2) "whether there are
> alternative means of justifying that right that remain open to prison inmates,"
> (3) "the impact accommodation of the asserted constitutional right will have
> on guards and other inmates, and on the allocation of prison resources
> generally," and (4) "whether the absence of ready alternatives is evidence of
> the reasonableness of a prison regulation." Weighing these factors, based on
> a summary judgment record, we rejected in Oliver[ v. Scott] a similar
> challenge on the grounds that "constant surveillance, even cross-sex
> surveillance, of prisoners is constitutional because it is reasonably related to
> the penological interest of maintaining security." The [Oliver] court found
> that, as here, comprehensive surveillance by all guards increases the overall
> security of the prison, minimizing inmate-on-inmate violence and sexual
> assaults. Moreover, requiring only male guards to supervise inmates or doing
> away with security cameras in the bathroom and dressing areas could require
> the prison to increase staffing or reassign a large percentage of its staff, or
> both, and there is no readily identifiable alternative that would impose only
> de minimis expenses in terms of inmate security, staffing costs, or equal
> employment opportunities. Garrett makes no privacy-specific argument on
> appeal beyond his contention that "the placement of recording cameras in the
> restroom, shower, and dressing quarters in men's prisons only [is] a gender
> based discrimination, thus violating equal protection to privacy" and "4th
> Amendment reasonable expectation of privacy." In light of Oliver, Garrett's
> complaint, and his Spears hearing testimony, we affirm the magistrate
> judge's finding that his conclusional allegation of a privacy claim is
> indisputably meritless.

Id. at 380-81 (quoting Turner v. Safley, 482 U.S. 78, 89-90 (1987); Oliver v. Scott, 276

F.3d 736, 745-46 (5th Cir. 2002)) (citing Mitchell v. Quarterman, 515 F. App'x 244, 247

(5th Cir. 2012); Johnson v. Phelan, 69 F.3d 144, 147 (7th Cir. 1995); Timm v. Gunter, 917

F.2d 1093, 1101-02 (8th Cir. 1990); <u>Michenfelder v. Sumner</u>, 860 F.2d 328, 334 (9th Cir.

1988)); <u>accord</u> <u>Story v. Foote</u>, 782 F.3d 968, 971-72 (8th Cir. 2015); <u>Kemp v. Black Hawk</u>

<u>Cnty. Jail</u>, No. C15-2094-LRR, 2017 WL 581316, at *9 (N.D. Iowa Feb. 13, 2017) (citing

<u>Story</u>, 782 F.3d at 971-72; <u>Garrett</u>, 560 F. App'x at 308-81; <u>United States v. Hogan</u>, 539

F.3d 916, 923 (8th Cir. 2008); <u>Timm</u>, 917 F.2d at 1101-02); <u>Patin v. LeBlanc</u>, No. 11-3071,

2012 WL 3109402, at *20 (E.D. La. May 18, 2012), <u>report & recommendation adopted</u>,

No. 11-3071, 2012 WL 3109398 (E.D. La. July 31, 2012).

I find that Warren has failed to describe circumstances that would constitute a

violation of any constitutionally recognized privacy rights.  The Sheriff's alleged video

surveillance resulting in plaintiff "being exposed to the web cameras" and that "all the

world can see" him when he uses the bathroom, even if in poor taste, does not amount to

a constitutional violation of any recognized right to privacy Warren may have had in jail.

Two key elements bar Warren from succeeding on his claim of a constitutional violation

of any right to privacy.

First, plaintiff had no expectation of privacy while using the bathroom.  There is

little meaningful difference between a jail official observing Warren in person and officials'

videotaping of Warren in a bathroom area, since Warren had no expectation that he would

<u>not</u> be viewed by his jailers while in the bathroom.  As the Fifth Circuit found in <u>Garrett</u>,

constant and comprehensive surveillance, even cross-sex surveillance, of prisoners is

reasonably related to the penological interest of maintaining security because such

surveillance increases the overall security of the prison, minimizing inmate-on-inmate

violence and sexual assaults, and there is no readily identifiable alternative that would impose only de minimis expenses in terms of inmate security, staffing costs or equal employment opportunities.  Warren testified that an inmate had previously committed suicide in the bathroom, that the bathroom partitions were taken down to prevent that kind of inmate harm and that a guard had viewed videotape of the bathroom on another occasion to identify the aggressor in a fight between prisoners.  OPP officials' actions of removing the partitions, videotaping the bathroom and reviewing the videotape as part of their job functions are reasonably related to the penological interest of maintaining security.

Second, Warren does not assert that the video caused him either "real and immediate" or "substantial and immediate" harm.  Scott, 1994 WL 283621 at *1, *2.  Warren testified that, if the prison guard could see the video of the fight on her phone, he assumed that any member of the public could also view the OPP security videos by hacking into the system, although he conceded he did not know that as a fact.  Any possible harm to Warren is so speculative as to be nonexistent.  He asserts that only one known person, a security guard, actually viewed videotape of the bathroom area on one occasion.  Absent some greater showing of both an expectation of privacy and actual harm, Warren's claim must fail.

Finally, plaintiff's claim is also deficient under Section 1983 because he fails to allege "physical injury" sufficient to support his claim for compensatory damages.  Specifically, the Prison Litigation Reform Act of 1996 includes the following requirement in 42 U.S.C. § 1997e(e):  "No Federal civil action may be brought by a prisoner confined

in a jail, prison, or other correctional facility, <u>for mental or emotional injury</u> while in custody without a prior showing of physical injury." (Emphasis added). Warren does not allege any specific "injuries" in this case, but complains of his fear that any person with the proper "website information" could pull up the OPP security video on a smart phone and invade his privacy.

The Fifth Circuit has consistently enforced the statutory physical injury requirement for prisoners who seek damages for intangible emotional or psychological harm, such as Warren has alleged. <u>E.g.</u>, <u>Edler v. Hockley Cnty. Comm'rs Ct.</u>, 589 F. App'x 664, 670 (5th Cir. 2014); <u>Stauffer v. Gearhart</u>, 741 F.3d 574, 583 (5th Cir. 2014); <u>Geiger v. Jowers</u>, 404 F.3d 371, 375 (5th Cir. 2005); <u>Harrison v. Smith</u>, 83 F. App'x 630, 631 (5th Cir. 2003); <u>Herman v. Holiday</u>, 238 F.3d 660, 665 (5th Cir. 2001).

In this case, Warren has alleged no physical injuries or actual harm of any kind as a result of being videotaped. As Section 1997e(e) provides and Fifth Circuit case law makes clear, Warren is precluded as a matter of law from recovering damages for the minimal psychological or other emotional injury he has asserted. Thus, his complaint in this regard must be dismissed.

(B)    <u>Medical Care</u>

Warren was a pretrial detainee at all relevant times about which he complains. Before the Fifth Circuit's decision in <u>Hare v. City of Corinth</u>, 74 F.3d 633 (5th Cir. 1996), it appeared that prison officials must provide pretrial detainees with reasonable medical care unless the failure to provide it was reasonably related to a legitimate government

interest.  Bell v. Wolfish,  441 U.S. 520, 539 (1979); Cupit v. Jones, 835 F.2d 82, 85 (5th Cir. 1987); Mayweather v. Foti, 958 F.2d 91 (5th Cir. 1992).  The inquiry was "whether the denial of medical care . . . was objectively reasonable in light of the Fourteenth Amendment's guarantee of reasonable medical care and prohibition on punishment of pretrial detainees."  Pfannstiel v. City of Marion, 918 F.2d 1178, 1186 (5th Cir. 1990), abrogated on other grounds as recognized in Martin v. Thomas, 973 F.2d 449, 455 (5th Cir. 1992).

> In Hare, however, the Fifth Circuit held:

> (1) that the State owes the same duty under the Due Process Clause and the Eighth Amendment to provide both pretrial detainees and convicted inmates with basic human needs, including medical care and protection from harm, during their confinement; and (2) that a state jail official's liability for episodic acts or omissions cannot attach unless the official had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk.

Hare, 74 F.3d at 650. The Fifth Circuit explained that for the Bell "reasonable relationship" test to be applicable, the pretrial detainee must be able to show that a prison official's act either "implement[s] a rule or restriction or otherwise demonstrate[s] the existence of an identifiable intended condition or practice" or that the "official's acts or omissions were sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by other officials, to prove an intended condition or practice."  Id. at 645.  If the pretrial detainee is unable to prove either, the incident will be considered to be an episodic act or omission and the deliberate indifference standard enunciated in Estelle v. Gamble, 429 U.S. 97, 104 (1976), will apply.  Shepherd v. Dallas Cnty., 591 F.3d 445, 452

(5th Cir. 2009) (citing <u>Bell</u>, 441 U.S. at 539; <u>Scott v. Moore</u>, 114 F.3d 51, 53 (5th Cir. 1997); <u>Hare</u>, 74 F.3d at 649); <u>Tamez v. Manthey</u>, 589 F.3d 764, 769-70 (5th Cir. 2009) (citing <u>Scott</u>, 114 F.3d at 53; <u>Hare</u>, 74 F.3d at 649).

In <u>Estelle</u>, the Supreme Court held that a convicted prisoner may succeed on a claim for damages under 42 U.S.C. § 1983 for inadequate medical care only if he demonstrates that there has been "deliberate indifference to serious medical needs" by prison officials or other state actors. Only deliberate indifference, "an unnecessary and wanton infliction of pain . . . or acts repugnant to the conscience of mankind," constitutes conduct proscribed by the Eighth Amendment. <u>Id.</u> at 105-06; <u>accord</u> <u>Gregg v. Georgia</u>, 428 U.S. 153, 182-83 (1976); <u>Tamez</u>, 589 F.3d at 770; <u>Hare</u>, 74 F.3d at 650. "Deliberate indifference" means that a prison official is liable "only if he knows that the inmates face a substantial risk of serious harm and [he] disregards that risk by failing to take reasonable measures to abate it." <u>Farmer v. Brennan</u>, 511 U.S. 825, 847 (1994). The <u>Farmer</u> definition applies to Eighth Amendment medical claims. <u>Reeves</u>, 27 F.3d at 176.

An inmate must satisfy two requirements to demonstrate that a prison official has violated the Eighth Amendment. If the court finds that one of the components of the test is not met, it need not address the other component. <u>Davis</u>, 157 F.3d at 1005. "First, the deprivation alleged must be, objectively, 'sufficiently serious'; a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities." <u>Farmer</u>, 511 U.S. at 834 (quotation omitted). Thus, plaintiff must show that defendants "exhibited deliberate indifference to his serious medical needs." <u>Cooper v. Johnson</u>, 353

F. App'x 965, 967 (5th Cir. 2009) (citing <u>Wilson v. Seiter</u>, 501 U.S. 294, 297 (1991));

<u>accord</u> <u>Harris v. Hegmann</u>, 198 F.3d 153, 159 (5th Cir. 1999); <u>Mendoza v. Lynaugh</u>, 989

F.2d 191, 193 (5th Cir. 1993).

Further, plaintiff must establish that the defendant possessed a culpable state of

mind.  <u>Farmer</u>, 511 U.S. at 838 (citing <u>Wilson</u>, 501 U.S. at 298).  A prison official cannot

be held liable "unless the official knows of and disregards an excessive risk to inmate

health or safety; the official must both be aware of facts from which the inference could be

drawn that a substantial risk of serious harm exists, and he must also draw the inference."

<u>Id.</u> at 837; <u>accord</u> <u>Tamez</u>, 589 F.3d at 770 (citing <u>Thompson v. Upshur County</u>, 245 F.3d

447, 458-59 (5th Cir. 2001)).  "Such a showing requires the inmate to allege that prison

officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly,

or engaged in any similar conduct that would <u>clearly evince a wanton disregard</u> for any

serious medical needs.'"  <u>Brewster v. Dretke</u>, 587 F.3d 764, 770 (5th Cir. 2009) (quoting

<u>Domino v. Tex, Dep't of Crim. Justice</u>, 239 F.3d 752, 756 (5th Cir. 2001)) (emphasis

added).

> The Supreme Court has recently reaffirmed that "deliberate indifference"
>
> is a <u>stringent</u> standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. . . .  The "deliberate indifference" standard permits courts to separate omissions that "amount to an intentional choice" from those that are merely "unintentionally negligent oversight[s]."

<u>Southard v. Tex. Bd. of Crim. Justice</u>, 114 F.3d 539, 551 (5th Cir. 1997) (quoting <u>Bd. of</u>

<u>Cnty. Comm'rs v. Brown</u>, 520 U.S. 397, 410 (1997) (other quotations omitted)) (emphasis

added); accord Tamez, 589 F.3d at 770. "'Subjective recklessness,'" as used in the criminal law, is the appropriate test for deliberate indifference." Norton v. Dimazana, 122 F.3d 286, 291 (5th Cir. 1997).

In the instant case, plaintiff's pleadings, as expanded by his testimony, establish that nothing more than episodic acts or omissions as defined in Hare are at issue. See Tamez, 589 F.3d at 770 (defendants' alleged refusal "to provide [prisoner] with immediate medical treatment qualifies as an 'episodic act or omission'"). Therefore, the "deliberate indifference" standard applies and Warren must allege facts sufficient to establish that defendants knew he faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable measures to abate it. In this case, plaintiff wholly fails to allege facts sufficient to satisfy any of the essential elements of his claim, including especially the stringent "deliberate indifference" standard.

Initially, it cannot be concluded that the conditions that Warren described allegedly resulting from his hernia, hepatitis C, food allergies and old foot injury constituted serious medical needs that posed a substantial risk of harm in his particular circumstances. Despite plaintiff's complaints of hernia and foot pain, hepatitis C and rashes, multiple examinations by four doctors, nurses, and a nurse practitioner and lab tests failed to reveal any serious conditions. As Warren acknowledged, his conditions were repeatedly treated with physical examinations, medication, lab tests and diet orders. He was tested for hepatitis C, which was asymptomatic, and for his liver function, which was normal. As his testimony and the medical records establish, Warren did not suffer "a life-long handicap or permanent loss"

of the type required to constitute a serious medical need for constitutional purposes.  See

Hill v. Dekalb Reg'l Youth Detention Ctr., 40 F.3d 1176, 1188 (11th Cir. 1994) (citing

Monmouth Cnty. v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987) ("Where the delay [in

medical care] results in an inmate's suffering 'a life-long handicap or permanent loss, the

medical need is serious.'")); see also Stepnay v. Goff, 164 F. App'x 767, 770 (10th Cir.

2006) (Inmate with staff infection cannot avoid dismissal "by merely asserting conclusory

allegations that his condition obviously required a doctor's attention because most skin

conditions are not intuitively serious."); Tasby v. Cain, 86 F. App'x 745, 746 (5th Cir.

2004) (Plaintiff's assertion that he developed a rash from being placed in restraints "does

not establish that he suffered 'serious harm.'"); Gonzalez-Reyna v. Ellis, No. 1:09cv522,

2009 WL 2421482, at *3 (E.D. Va. July 27, 2009) ("[I]t is doubtful that a skin rash, even

one which causes pain and itching, is a sufficiently serious medical need to support an

Eighth Amendment violation.").

A hernia does not automatically present a serious medical need for purposes of

constitutional analysis.  Facts developed in other cases have established that

> there are three types of hernia situations:  (1) a hernia that is strangulated,
> which is a medical emergency mandating surgery; (2) a hernia that is
> reducible yet so painful or debilitating that surgery is required; and (3) a
> hernia that is reducible and, given the dangers and risks inherent in any
> operation, can be treated through non-surgical means.

Johnson v. Doughty, 433 F.3d 1001, 1014 (7th Cir. 2006); see also Dawson v. Corr. Corp.,

No. 15-CV-643, 2015 WL 4092782, at *2 (W.D. La. July 6, 2015) (citing Clark v. Adams,

233 F. App'x 400 (5th Cir. 2007); Mesa v. Kasule, No. 9:12cv42, 2013 WL 2151706 (E.D.

Tex. May 15, 2013); <u>Jones v. Schmidt</u>, No. 13-685, 2014 WL 6772493 (M.D. La. Dec. 1, 2014)) ("Courts have often found that a failure to undertake surgical intervention for a reducible hernia is not deliberate indifference to a serious medical need."); <u>Williams v. First Corr. Med.</u>, 377 F. Supp. 2d 473, 476 (D. Del. 2005) (no serious medical need when defendant physician attested that "plaintiff's hernia is 'very small,' 'reducible' and that plaintiff has not shown any signs of complications"). The current record indicates that Warren's hernia presents no immediate medical emergency and is not so debilitating that immediate surgery is required. Dr. Dunbar opined that Warren's easily reducible hernia did not present an emergency and did not require surgery. At this point in time, at least, it cannot be concluded that plaintiff's hernia presents a serious medical need for purposes of constitutional analysis.

Warren alleges that he received no treatment for hepatitis C while in OPP, but he admittedly had not received any treatment for this condition before his incarceration. At OPP, he received a blood test that confirmed his diagnosis of hepatitis C and a hepatic function panel with results within normal limits. A diagnosed condition for which plaintiff does not require medical treatment is not a serious medical need. <u>Johnson v. Kelly</u>, 184 F. App'x 427, 429 (5th Cir. 2006); <u>Etheridge v. Helton</u>, No. 1:09-0067, 2011 WL 1627976, at *5 (M.D. Tenn. Apr. 29, 2011), <u>report & recommendation adopted</u>, 2011 WL 2078564 (M.D. Tenn. May 26, 2011). Various courts have found that chronic, asymptomatic hepatitis C, such as Warren has, is a non-serious medical condition for purposes of Section 1983 analysis. <u>Weavel v. Pleasant</u>, No. 4:12CV-P75-M, 2013 WL 3984566, at *3 (W.D.

Ky. Aug. 1, 2013) (citing Hix v. Tenn. Dep't of Corr., 196 F. App'x 350, 357 n.1 (6th Cir.

2006); Alley v. Dowis, No. 09-cv-027130WYD, 2011 WL 3682759, at *9 (D. Colo. May

2, 2011)); Holt v. Enenmoh, No. 1:10-cv-02385-SKO, 2012 WL 14025, at *3 (E.D. Cal.

Jan. 4, 2012) (citing Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000)); Moore v.

Bennett, 777 F. Supp. 2d 969, 980 (E.D.N.C. 2011), aff'd, 446 F. App'x  579 (4th Cir.

2011); Gray v. Hernandez, No. 08-1147-JM, 2010 WL 6230519, at *5 (S.D. Cal. Nov. 30,

2010), report & recommendation adopted as modified on other grounds, 2011 WL 1043619

(S.D. Cal. Mar. 22, 2011).

> To be actionable, the detention officers' conduct must demonstrate
> subjective awareness of a substantial risk of serious harm and a failure to take
> reasonable measures to abate this risk.   The "deliberate indifference"
> standard, however, is not an obligation for government officials to comply
> with an optimal standard of care.   Rather, it is an obligation not to disregard
> any substantial health risk about which government officials are actually
> aware.   Under Gobert v. Caldwell, 463 F.3d 339, 345 n.12 (5th Cir. 2006),
> "[a] serious medical need is one for which treatment has been recommended
> or for which the need is so apparent that even laymen would recognize that
> care is required."  Disagreements with diagnostic measures are insufficient
> to give rise to a claim of deliberate indifference to medical needs.

Kitchen v. Dallas Cnty., 759 F.3d 468, 482 (5th Cir. 2014) (footnotes, additional citations

and quotations omitted).  The symptoms and conditions described by Warren and the

medical records do not reflect that he had a serious medical need while at OPP.

Even assuming, however, but certainly without concluding that his conditions

presented a serious medical need for constitutional purposes, Warren has alleged facts,

confirmed by his testimony and the medical records, that negate any inference of deliberate

indifference by jail officials.  His complaint, as amended by his testimony and confirmed

by the medical records, shows that he received constitutionally adequate medical care while incarcerated in OPP.

Warren testified and his medical records confirm that he was seen by doctors, nurses and a nurse practitioner and that his conditions were treated with physical examinations, testing, medication and diet orders.  Plaintiff's testimony and medical records confirm that his conditions were monitored and addressed by medical personnel during his stay in OPP, and that those professionals exercised their medical judgment regarding his need, or lack of need, for treatment.

Although plaintiff complains that he received no treatment for hepatitis C, the medical records reflect that prison doctors diagnosed him with hepatitis C and ordered tests to monitor his health.  See Harris v. Epps, 523 F. App'x 275 (5th Cir. 2013) (citing Domino, 239 F.3d at 756; Banuelos, 41 F.3d at 235) (When the record showed that inmate received treatment for hepatitis C, consisting of monitoring via tests and regular examinations, "his claim amounts to a disagreement with the treatment and a desire for more.  That is not enough for a viable claim of deliberate indifference."); Concepcion v. Pickles, 450 F. App'x 72, 74 (2d Cir. 2011) (failure to provide medication for more than one year to prisoner with HIV was not deliberate indifference when his blood count was consistently monitored and treatment began promptly when his blood count fell below a certain level); Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484, 504 (1st Cir. 2011) (medical director was not deliberately indifferent to HIV-positive inmate's complaint that he had not received any medication, when director investigated and found that plaintiff had recently

been seen by clinic providers, his blood had been drawn for lab tests and he had a followup appointment with HIV specialty clinic); Brightwell v. Lehman, 637 F.3d 187, 194 (3d Cir. 2011) (failure to provide diabetic diet to diabetic inmate was not deliberate indifference when inmate "received appropriate accommodations and regular medical screenings"); Radunz v. Muhlhausen, 375 F. App'x 618, 620-21(7th Cir. 2010) (no deliberate indifference when inmate received regular medication, blood-sugar checks and special diet for diabetes); Cody v. CBM Corr. Food Servs., 250 F. App'x 763, 765 (8th Cir. 2007) (summary judgment proper on inmate's claim that defendant failed to provide him with a special diabetic diet, as ordered by the doctor, when inmate presented no evidence of immediate danger to his health or that his health suffered due to failure to provide prescribed diet); Greer v. Tran, 124 F. App'x 261, 262 (5th Cir. 2005) (Although prisoner ultimately died after falling into a diabetic coma, there was no deliberate indifference to his serious medical needs when he was tested for diabetes mellitus, which was ruled out.); Harris v. Donaldson, 71 F.3d 876, 1995 WL 725438, at *2 (5th Cir. Nov. 3, 1995) (prisoner received treatment for diabetes, including blood sugar level monitoring, insulin doses and other attention, rendering his medical care claim merely a "quarrel with the quality and quantity of his medical treatment").

Although Warren has alleged delay in receiving medical care in that he did not receive the treatment he thought was necessary quickly enough, and he has expressed dissatisfaction with the overall speed, quality and initial effectiveness of treatment, none

of his allegations rise to the level of deliberate indifference necessary to establish a constitutional violation cognizable under Section 1983.

> [T]he decision whether to provide additional treatment is a classic example of a matter for <u>medical judgment</u>.  A showing of deliberate indifference requires the prisoner to submit evidence that prison officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.  Deliberate indifference is an extremely high standard to meet.

<u>Gobert</u>, 463 F.3d at 346 (footnotes, citations and internal quotations omitted) (emphasis added).  No such showing has been made on the current record.  In Warren's case, the decisions of Drs. Nguyen, Kennedy, Gonzalez and Dunbar and a nurse practitioner not to provide him with additional treatment for alleged conditions that they found were medically unsupported were classic examples of the exercise of "medical judgment," which, even if incorrect, cannot serve as the basis for a finding of deliberate indifference in the constitutional sense.

Mere delay in receiving care is not in and of itself a constitutional violation.  <u>Easter v. Powell</u>, 467 F.3d 459, 463 (5th Cir. 2006); <u>Mendoza</u>, 989 F.2d at 195; <u>Wesson v. Oglesby</u>, 910 F.2d 278, 284 (5th Cir. 1990).  Regardless of the length of delay, plaintiff at a minimum must show deliberate indifference to serious medical needs.  <u>Wilson</u>, 501 U.S. at 298.  No such showing can be made in this case in light of the continuing medical attention Warren has received for his hernia, allergies, rashes, foot pain and hepatitis C complaints during his incarceration at OPP.

Contentions like Warren's that amount to a mere disagreement with the speed, quality or extent of medical treatment or even negligence do not give rise to a Section 1983 claim. "[A]lthough inadequate medical treatment may, at a certain point, rise to the level of a constitutional violation, malpractice or negligent care does not." Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999) (citation omitted) (active treatment of prisoner's serious medical condition, which ultimately resulted in death, does not constitute deliberate indifference, even if treatment was negligently administered); see also Estelle, 429 U.S. at 107 (The "question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice . . . .") (emphasis added); Rowe v. Norris, 198 F. App'x 579, 581 (8th Cir. 2006) (no constitutional violation when inmate disagreed with physician's choice of medication); Marksberry v. O'Dea, 173 F.3d 855, 1999 WL 98533, at *2 (6th Cir. Jan. 28, 1999) (plaintiff who alleged inadequate treatment for broken hand failed to state constitutional violation, when he was examined by physician and received x-rays and medication); Corte v. Schaffer, 24 F.3d 237, 1994 WL 242793, at *1 (5th Cir. 1994)) (Contrary to plaintiff's allegation that he had received "no treatment" because he believed he needed a referral to a specialist, he failed to demonstrate deliberate indifference when he was seen by prison medical personnel with results being within a normal range.); Mendoza, 989 F.2d at 193 (prisoner's disagreement with the type or timing of medical services provided cannot support a Section 1983 claim); Wesson, 910 F.2d at

32

284 (allegations establishing provision of medical treatment are inconsistent with inference of deliberate indifference); Whitlock v. Merchant, No. 5:14CV119, 2015 WL 5909776, at *10 (E.D. Tex. Sept. 21, 2015) ("The fact that [plaintiff] was prescribed a diet which is recommended for his medical condition hardly bespeaks deliberate indifference."); Williams v. Browning, No. V-03-157, 2006 WL 83433, at *1, *3 (S.D. Tex. Jan. 11, 2006) (inmate with diabetes, hypertension, anxiety and chronic knee ailment who alleged that he was unable to obtain his medications timely, but did not establish any substantial harm from the delay, failed to state a claim for deliberate indifference).

In McBarron v. Federal Bureau of Prisons, 332 F. App'x 961 (5th Cir. 2009), a federal prisoner complained, as Warren does in this case, that he had not been provided with surgery for an inguinal hernia that had been recommended by a doctor.  Applying the same constitutional standards applicable under Section 1983, including its Stewart decision cited above, the Fifth Circuit affirmed the district court's dismissal of the prisoner's medical care claim. The court ruled that a mere "difference of opinion as to the course of treatment or need for surgery does not constitute deliberate indifference."  Id. at 964. Plaintiff "may not have received all the treatment that he desired as quickly as he wanted, but . . . he was not ignored, . . . he was given pain medication, and . . . surgery was approved once it became medically necessary.  No showing of deliberate indifference is made."  Id.  Deliberate indifference requires an inmate to show that "'prison officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or

engaged in any similar conduct that would clearly evince a wanton disregard of any serious medical needs.'" Id. (quoting Domino, 239 F.3d at 756).

Under these circumstances, plaintiff cannot state a cognizable Section 1983 claim that defendants were deliberately indifferent to his serious medical needs. For all of the foregoing reasons, plaintiff's complaints in this case about his medical care advance a legally frivolous argument and fail to state a claim for relief based upon violation of his constitutional rights under Section 1983.

(C)    Meals

Warren was a pretrial detainee at all relevant times about which he complains. He testified that the meals provided to him at OPP "are not ideal" in that they are overcooked and not properly prepared for his diet, which requires "no seasoning, no fish and no mayonnaise products" because of his food allergies. He also complained that, although he gets vegetables, he does not get fruit or milk.

Warren's written allegations and testimony do not rise to a level of seriousness constituting a constitutional violation. Certainly, food and water must be provided to prisoners. States violate the Constitution if they fail to provide prisoners with reasonably adequate food, water, clothing, shelter and sanitation. Gates v. Cook, 376 F.3d 323, 332 (5th Cir. 2004) (citing Farmer, 511 U.S. at 832). Constitutional standards require only that prison authorities provide an inmate with the basics in this regard, including "'well-balanced meal[s], containing sufficient nutritional value to preserve health.'" Berry v.

Brady, 192 F.3d 504, 507 (5th Cir. 1999) (quoting Green v. Ferrell, 801 F.2d 765, 770 (5th Cir. 1986)).

The Constitution does not require that inmates be provided with particular consumables at a certain temperature or levels of tastiness or with every culinary amenity that one may find desirable. Robles v. Coughlin, 725 F.2d 12, 15 (2d Cir. 1983); Wolfish v. Levi, 573 F.2d 118, 125 (2d Cir. 1978), rev'd on other grounds sub nom. Bell v. Wolfish, 441 U.S. 520 (1979) (citing Newman v. Alabama, 559 F.2d 283, 291 (5th Cir. 1977)). "Although [plaintiff] is entitled to basic health care needs met, he does not have a right to the best diet available and there is no guarantee that every item served will meet his standards." Barton v. Dietician, No. H-12-1069, 2012 WL 3063904, at *3 (S.D. Tex. July 26, 2012) (citing Mayweather v. Foti, 958 F.2d 91 (5th Cir.1992); Varnado v. Lynaugh, 920 F.2d 320, 321 (5th Cir. 1991)).

> In addition, there is no violation if the inmate has been subjected to an isolated incident of food poisoning or if he has been negligently fed food that might be injurious to his health. The inmate must allege facts which show that the defendant jail official has provided him with food that endangers his health and that the defendant was acting with deliberate indifference. To establish deliberate indifference, it must be shown that (1) the defendant was aware of facts from which he could deduce that the inmate health was at risk and (2) that the defendant actually drew an inference that the potential for harm existed. It must be alleged that the defendant knew of the inmate's condition and disregarded it.

Id. at *2 (citing Farmer, 511 U.S. at 837; Green v. Atkinson, 623 F.3d 278, 280-281 (5th Cir. 2010); Brewster, 587 F.3d at 770; Palmer v. Johnson, 193 F.3d 346, 352 (5th Cir.

1999); Martin v. Scott, 156 F.3d 578, 580 (5th Cir. 1998); Bradley v. Puckett, 157 F.3d 1022, 1025 (5th Cir. 1998)).

Warren alleges no serious harm or risk of serious harm in the constitutional sense, and the court can perceive none under the circumstances described in his testimony and written submissions. He has failed to set forth facts to establish a deprivation of or deviation from this quality of food or water. The only illness or other kind of physical problems that plaintiff experienced as a result of the food he ate was the loss of "a few pounds" and an allergic skin reaction, which was treated topically and with oral and injected antihistamines. Warren does not allege that the food he was given had insufficient nutritional value to preserve health. The medical records indicate that he was not entirely compliant with his diet and medication.

Plaintiff was given diet orders that accounted for his food allergies, received treatment and medications to treat his allergic reactions, and was ordered moved to another cell by the medical department on November 15, 2016. These actions negate any inference that jail officials were deliberately indifferent to a substantial risk of harm. Id. at *3 (citing Banuelos v. McFarland, 41 F.3d 232, 235 (5th Cir. 1995); Mendoza, 989 F.2d at 193-95). Even if prison officials were negligent in occasionally serving Warren some food to which he was allergic, his "rights are not violated by being served an occasional meal of which he cannot eat its entirety" when there are other foods available that he can eat. Id. (citing Berry, 192 F.3d at 507-08). Warren's testimony showed that other types of food were

available.  Even if defendants sometimes failed to provide Warren with non-allergenic

foods in compliance with his diet orders, he

> has not demonstrated that the alleged deficiencies in the food service [of
> serving food to which he was allergic] subjected him to a substantial risk of
> harm.  Nor has plaintiff shown that any of the defendants were deliberately
> indifferent to his health.  The defendants' failure to follow prison regulations,
> rules or procedures does not rise to the level of a constitutional violation.

Trainer v. Outlaw, No. 1:08-CV-565, 2011 WL 2633726, at *4 (E.D. Tex. May 10, 2011),

report & recommendation adopted, 2011 WL 2632355 (E.D. Tex. July 1, 2011) (citing

Stanley v. Foster, 464 F.3d 565, 569 (5th Cir. 2006); Balli v. Haynes, 804 F.2d 306, 308

(5th Cir. 1986)).

 Plaintiff has plainly failed to show a constitutional violation in this regard.

(D)    Verbal Harassment

Plaintiff testified that he was subjected to verbal mistreatment by Nurse Martin when

she made "very unprofessional comments" during an incident in which he questioned the

medical unit's slow response to another inmate's medical issue.  Warren said that Nurse

Martin responded, "You just shut the fuck up . . . and let me do my job."  When Warren

replied that he would tell Sheriff Gusman about it, Nurse Martin told him "you don't need

to tell Gusman about this."

These allegations of harassment are not cognizable under Section 1983.  Verbal

threats by prison staff or other inmates do not rise to the level of a constitutional violation.

Field v. Corr. Corp., 364 F. App'x 927, 930 (5th Cir. 2010) (citing Robertson v. Plano City,

70 F.3d 21, 24 (5th Cir. 1995)); Matthews v. Graham, 235 F.3d 1339, 2000 WL 1672660, at *1 (5th Cir. 2000) (citing McFadden v. Lucas, 713 F.2d 143, 146 (5th Cir. 1983)); see Brand v. Hamilton, No. 3:10CV377 LAC MD, 2010 WL 4973358, at *4-5 (N.D. Fla. Oct. 27, 2010), report & recommendation adopted, 2010 WL 4955400 (N.D. Fla. Dec. 1, 2010) (pretrial detainee's claim that officer verbally threatened him with physical assault not cognizable under section 1983) (citing McFadden, 713 F.2d at 146; Evans v. City of Zebulon, 351 F.3d 485,495-96 (11th Cir. 2003), vacated, 364 F.3d 1298 (11th Cir. 2004), rehearing en banc granted on other grounds sub nom. Evans v. Stephens, 407 F.3d 1272 (11th Cir. 2005); Bender v. Brumley, 1 F.3d 271, 274 (5th Cir. 1993)) (additional citations omitted).

"Claims of hurt feelings, humiliation, and other heartfelt, yet objectively trivial indignities, are not of Constitutional moment . . . ." Jackson v. Liberty Cnty., 860 F. Supp. 360, 363 (E.D. Tex. 1994). "Verbal harassment and abusive language, while unprofessional and inexcusable, are simply not sufficient to state a constitutional claim under 42 U.S.C. § 1983." Slagel v. Shell Oil Ref., 811 F. Supp. 378, 382 (C.D. Ill. 1993), aff'd, 23 F.3d 410 (7th Cir. 1994) (quotation and citation omitted).

In this case, plaintiff's allegations of verbal abuse do not rise to the level of a constitutional violation, and these allegations fail to state a claim upon which relief may be granted.

(E)    <u>MOTIONS FOR TRO/PRELIMINARY INJUNCTION</u>

Plaintiff has filed two (2) motions for a preliminary injunction or temporary restraining order in this matter.  Record Doc. Nos. 27, 30.  In both motions, Warren reiterates his claims of inadequate medical care for his hernia, allergies and hepatitis C and of being served food to which he is allergic.  He asks the court to order his release so he can obtain proper medical care and avoid the "imminent danger" of a possibly "fatal" allergy attack.  Record Doc. No. 27 at pp. 2, 4; Record Doc. No. 30 at pp. 3-4.

In his second motion, Warren also asks the court to "correct" the supplemental medical records provided by counsel for the Sheriff on December 1, 2016, Record Doc. No. 26.  Warren asserts that the supplemental records do not include his (1) "medical visit held on December 02nd 2016 with Doctor Nguyen;" (2) a "medical order to have Plaintiff removed from his assigned cell to an open dormitory due to allergic reactions to paint" and (3) an appointment with "N. P. P. Walker on November 15th, 2016, [who] ordered that Plaintiff be removed from his assigned cell," which allegedly was not done.  Record Doc. No. 30 at p. 2.  In this motion, Warren also asserts a new claim that defendants engaged in racial discrimination against him when they selected individual inmates to be seen by outside doctors.  He alleges that "statistics do indicate that . . . more white inmates than black inmates . . . are seen [and] referred to" outside doctors.  <u>Id.</u> at p. 5.

According to Rule 65(b) of the Federal Rules of Civil Procedure, a party seeking a preliminary injunction must set forth "specific facts in an affidavit or a verified complaint"

that "clearly show that immediate and irreparable injury, loss, or damage will result to the movant."  A preliminary injunction is an <u>extraordinary</u> equitable remedy that may be granted <u>only</u> if plaintiff clearly carries his burden of establishing four essential elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that he will suffer irreparable injury if the injunction is denied; (3) the threatened injury outweighs any damage that the injunction might cause defendants; <u>and</u> (4) the injunction will not disserve the public interest.  <u>Winter v. Natural Res. Def. Council, Inc.</u>, 555 U.S. 7, 24 (2008); <u>Voting for Am. Inc. v. Steen</u>, 732 F.3d 382, 386 (5th Cir. 2013); <u>Planned Parenthood Ass'n of Hidalgo Cnty. Tex., Inc. v. Suehs</u>, 692 F.3d 343, 348 (5th Cir. 2012); <u>S. Co. v. Dauben Inc.</u>, 324 F. App'x 309, 314 (5th Cir. 2009).  Part of the requisite showing is "a <u>substantial</u> threat of <u>irreparable</u> injury if the injunction is not issued."  <u>DSC Commc'ns Corp. v. OGI Techs., Inc.</u>, 81 F.3d 597, 600 (5th Cir. 1996) (emphasis added); <u>accord</u> <u>S. Co.</u>, 324 F. App'x at 319.

Applying the foregoing legal standards to the facts alleged in plaintiff's written submissions and testimony and the overall record establish that Warren is <u>not</u> entitled to preliminary injunctive relief.  First, a hearing has been held pursuant to <u>Spears v. McCotter</u>, 766 F.2d 179 (5th Cir. 1985), and I have recommended that plaintiff's complaint be dismissed in its entirety for all the reasons set out above.  Thus, it cannot be concluded that the complaint presents "a substantial likelihood of success on the merits."  <u>Pharm. Research & Mfrs. v. Walsh</u>, 538 U.S. 644, 662 (2003) (citation omitted); <u>DSC Commc'ns Corp.</u>, 81

F.3d at 600.  In addition, the potent affirmative defense of qualified immunity is available to all defendants.

Second, Warren has not established that he faces a substantial threat of serious injury that would be irreparable.  His testimony and written allegations establish no constitutional violation for the reasons discussed above and therefore no constitutional injury that would be irreparable.  In addition, injury or other harm is not irreparable for Rule 65 purposes if an adequate alternate remedy in the form of money damages is available.  11A C. Wright, A. Miller, et al., Federal Practice and Procedure § 2948.1, text at n.2 and cases cited therein (3d ed., on Westlaw at database FPP 2948.1).  "Speculative injury is not sufficient," and only "a strong threat of irreparable injury before trial" will serve as an adequate basis for preliminary injunctive relief.  Id. text at nn. 9, 12 (emphasis added).  Although, "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary," id. text at n.26, Warren has failed to establish any such constitutional violation, all as discussed above.  Thus, the second factor also weighs against granting his motion.

Finally, the third and fourth factors – (a) balancing of the threatened injury against any damage it might cause to defendants and (b) the public interest – are related in this instance.  I find that defendants' interests and the damage they may suffer by entry of the sort of court order sought by Warren would involve this court's unwarranted interference with the administration of prison functions, including the maintenance of security and

jailhouse discipline and appropriate custodial classification, in a way that would disserve the public interest.  Courts must accord great deference to prison officials' administrative decisions and will not interfere with legitimate administration, including especially the "essential goals" of "maintaining institutional security and preserving internal order and discipline," in the absence of a constitutional violation.  Bell, 441 U.S. at 546-48; accord Smith v. Bingham, 914 F.2d 740, 742 (5th Cir. 1990).  State officials have broad discretionary authority concerning the placement of prisoners in a particular status and in the maintenance of prison discipline.  Under the circumstances described by Warren, the Constitution affords him no constitutionally protected interest that might outweigh defendants' or the public's interests in prison administration and discipline.

Accordingly, Warren has not established the four factors necessary to obtain preliminary injunctive relief before trial.  On balance, all four factors weigh in favor of denying plaintiff's motions.

## RECOMMENDATION

For all of the foregoing reasons, it is **RECOMMENDED** that (1) plaintiff's motions for injunctive relief or temporary restraining order, Record Doc. Nos. 27 and 30, be **DENIED**, and (2) plaintiff's complaint asserting claims pursuant to 42 U.S.C. § 1983 be **DISMISSED WITH PREJUDICE** as legally frivolous and/or for failure to state a claim under 28 U.S.C. § 1915(e)(2) and 42 U.S.C. § 1997e(c)(1).

Because I am recommending that the complaint be dismissed as legally frivolous and/or for failure to state a claim as a screening matter pursuant to 28 U.S.C. § 1915A, **IT IS FURTHER RECOMMENDED** that defendant's motion to dismiss, Record Doc. No. 25, be **DISMISSED AS MOOT.**

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[17]

New Orleans, Louisiana, this _____9th_____ day of March, 2017.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[17]Douglass referred to the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen (14) days.